# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 5, 2014

## STATE OF TENNESSEE v. DONQUARIUS PERSON

**Appeal from the Criminal Court for Shelby County**
**No. 11-06594    Chris Craft, Judge**

---

**No. W2013-00843-CCA-R3-CD  - Filed May 20, 2014**

---

The defendant, Donquarius Person, appeals his Shelby County Criminal Court jury convictions of first degree murder, aggravated assault, and two counts of attempted first degree murder, challenging the admission of certain hearsay testimony that was admitted pursuant to the excited utterance exception and the sufficiency of the convicting evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Harry E. Sayle III (on appeal) and Mary Katherine Kent and Paul Pera (at trial), Assistant District Public Defenders, for the appellant, Donquarius Person.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case relate to the robbery and murder of the victim, Calvin Leon Sims, Jr. ("Mr. Sims, Jr."), and the attempted murders of the victim's father, Calvin Sims, Sr. ("Mr. Sims, Sr."), and the victim's friend, Freddie Sheffa, at the hands of the defendant. The proof adduced at trial established that the defendant lost money to Mr. Sims, Jr., playing dice, and the defendant, angered over the loss, procured a handgun and threatened violence against Mr. Sims, Jr., if he did not return the money. When Mr. Sims, Jr., refused, the defendant shot him twice. The defendant also shot Mr. Sheffa and Mr. Sims, Sr., before stealing money from the pockets of Mr. Sims, Jr.

In October 2011, the Shelby County grand jury charged the defendant with first degree felony murder, first degree premeditated murder, especially aggravated robbery, and two counts of attempted first degree murder. The trial court conducted a jury trial in January 2013.

Jeffrey Gloston, a lifelong friend of Mr. Sims, Jr.'s, testified that, at approximately 12:30 a.m. to 1:00 a.m. on May 19, 2011, he arrived at the house that Messers Sims shared. When Mr. Gloston entered the house, Mr. Sheffa walked outside and sat on the front porch. While Mr. Gloston and Mr. Sims, Jr., were talking and "having a beer or two," Mr. Gloston heard a loud pounding on the front door. Mr. Sims, Jr., immediately opened the door, admitting two people Mr. Gloston had never seen before, although Mr. Gloston had the impression that Mr. Sims, Jr., knew the two men. Mr. Gloston described one of the men as tall and the other as "kind of short." The tall man was discussing a dice game with Mr. Sims, Jr., while the shorter man stood a few feet away "trying to keep hisself out of it." Mr. Gloston testified that the tall man "just stood there with his hood on and his hand in his pocket at all times," which made Mr. Gloston feel uneasy. Mr. Gloston then asked Mr. Sims, Jr., to give him some money so that he could purchase beer and cigarettes at the store, something Mr. Gloston and Mr. Sims, Jr., had previously discussed. Mr. Sims, Jr., reached into his pocket and handed Mr. Gloston "a few ones and a couple of fives," and Mr. Gloston left the house. When Mr. Gloston returned approximately 10 to 15 minutes later, law enforcement officers were at the residence, and Mr. Gloston was transported to police headquarters for questioning.

On cross-examination, Mr. Gloston confirmed that the two men pounded on the Sims's front door approximately 30 to 40 minutes after Mr. Gloston had arrived at the house. Mr. Gloston estimated that the shorter man was "at least 5'3"," weighed a little less than 155 pounds, and was a "medium-skinned" African American. Mr. Gloston testified that the taller man stood 5'6" or 5'7" in height and was also an African American with a medium skin tone. Mr. Gloston acknowledged that, during the time he observed the interaction between Mr. Sims, Jr., and the tall man, neither man raised his voice or seemed angry. Mr. Gloston estimated that he returned to the Sims's house at approximately 2:00 a.m. Mr. Gloston testified that he did not know if the front porch light was on when he returned to the house.

On re-direct examination, Mr. Gloston confirmed that he did not observe the two men who entered the Sims's house for enough time to make a positive identification of either man.

Memphis Police Department ("MPD") Officer Justin Tutor testified that he was a uniformed patrol officer and that he was dispatched to a house on North Radford on May

19, 2011, following a 9-1-1 hang-up call. As he approached the residence in his patrol car, a woman flagged him down and directed him to the Sims's house. Officer Tutor approached the house and discovered an unresponsive man lying on the front porch, at which point Officer Tutor contacted the paramedics. Officer Tutor also noticed that both of the man's pants pockets were turned inside out. Officer Tutor then entered the residence and discovered a second victim sitting in a bedroom with his hands folded over his chest and stating that he thought he had been shot. Officer Tutor called for a second ambulance, and he and other officers began processing the crime scene. During that time, Officer Tutor was notified that a second 9-1-1 call had been placed, and, as a result of that call, Officer Tutor proceeded to the rear of the residence, where he heard someone moaning and asking for help. Officer Tutor noticed a bloody shirt hanging on a fence near the back of the property, and, on the other side of the fence, he discovered a third shooting victim. Officer Tutor noticed that this victim had been shot several times. Officer Tutor again contacted the paramedics, and he accompanied the third shooting victim to the hospital.

On cross-examination, Officer Tutor testified that it was just after 2:00 a.m. when he was dispatched to North Radford. Officer Tutor also confirmed that, when he arrived at the house, the interior front door was wide open, and the exterior iron storm door was closed.

Kimyatta Gilliam, Mr. Sims, Jr.'s, sister and Mr. Sims, Sr.'s, daughter, testified that she had grown up in the North Radford house. Ms. Gilliam identified for the jury photographs of the exterior of the house, which depicted two street lights in the immediate vicinity of the house. Ms. Gilliam testified that a third street light was not visible in the photographs, and she stated that the lights were bright enough to negate any need to turn on the front porch light.

In the early morning hours of May 19, Ms. Gilliam received a telephone call about the shooting, and she proceeded directly to the North Radford residence. When she arrived, she learned that her father had already been transported to the hospital, and she was able to see the body of her brother lying on the front porch. Ms. Gilliam left the scene and arrived at the hospital to visit her father just after 6:30 a.m. Mr. Sims, Sr., told Ms. Gilliam "that he heard gunshots and he walked . . . into the front and he didn't see my brother and so he opened the door to see what was going on and my brother was laying on the porch." Ms. Gilliam continued as follows:

> [Mr. Sims, Sr.,] said when my brother – when he saw my
> brother laying on the porch, he opened the door to go out there
> and help him. And he said he reached down to help my brother
> and my brother said, they got me, dad. And by the time he said

that, he saw somebody coming from the backyard and immediately start shooting at him. And so, he tried to run in the house. And he got – and he did get in the house, and he said, Kim, that's all I know. He said, I couldn't get my boy. I had to leave him out there.

When asked why Mr. Sims, Sr., could not testify as to what he saw, Ms. Gilliam explained that he had died in May 2012.

On cross-examination, Ms. Gilliam stated that she arrived at the North Radford house after 2:30 a.m., and she testified that Mr. Sheffa was living at the house with her father and her brother when the shooting occurred. Ms. Gilliam conceded that Mr. Sims, Sr., never mentioned who had shot him.

Freddie Sheffa testified that he had known Mr. Sims, Jr., for years but that he had lived at the North Radford residence for only six months. Mr. Sheffa stated that he was not present in the house during the dice game between the defendant and Mr. Sims, Jr., explaining that he did not arrive at the house until "twelve something, maybe one" in the morning of May 19. When he arrived, Mr. Sims, Jr., Mr. Sims, Sr., and Mr. Gloston were the only individuals at the residence. Mr. Sheffa borrowed Mr. Sims, Jr.'s cellular telephone to contact a friend regarding a battery. As a result of the telephone call, Mr. Sheffa walked out of the house and waited for his friend on the front porch. Approximately five to 10 minutes later, two men arrived at the house. Mr. Sheffa knew one of the men as Maceo, later identified as Daniel Rawlings, but Mr. Sheffa did not know the other man. Mr. Sheffa described the second man as someone whose face he had seen "here or there." Mr. Sheffa identified the defendant as the second man.

Mr. Sheffa testified that he heard the defendant ask Mr. Sims, Jr., if "'you going give me some.'" Mr. Sheffa did not know what this meant until he heard the defendant say, "'[M]an, you won three hundred dollars off me.'" Mr. Sims, Jr., responded that he had already returned some money to the defendant and that he was not going to give him anything else. Mr. Sims, Jr., then turned to Maceo and said, "'What, you got something to do with it.'" The defendant responded, with raised hands, "'I ain't come for no trouble.'" The defendant and Maceo then walked away as Mr. Gloston was leaving to go to the store. Approximately two to three minutes later, the defendant and Maceo returned to the porch. Mr. Sheffa stated that Maceo did not appear to have a weapon. Mr. Sheffa testified that the defendant pointed a gun at Mr. Sims, Jr.'s, chest and said, "'[L]et me get everything.'" When Mr. Sims, Jr., did not respond, the defendant shot him. Mr. Sheffa testified that Mr. Sims, Jr., started to fall after the first shot was fired, and Mr. Sheffa immediately ran. The defendant then shot Mr. Sheffa, causing him to flip over the porch rail onto the ground. Mr.

-4-

Sheffa jumped up and began running toward the back yard. The defendant pursued him and continued shooting Mr. Sheffa until Mr. Sheffa dove over a fence into a neighbor's yard. Mr. Sheffa then heard other gun shots, but he did not know their origin. Mr. Sheffa lost consciousness for a while before awakening and yelling for assistance. Mr. Sheffa testified that he counted five bullet holes in his body and that his injuries necessitated a month-long hospital stay followed by several more hospital visits.

Mr. Sheffa testified that, due to the lights in the vicinity of the porch, he was able to clearly see the defendant shoot Mr. Sims, Jr., and himself. Mr. Sheffa then stood and identified for the jury the multiple injuries from bullet wounds on his body, though it is unclear from the record exactly how many injuries Mr. Sheffa sustained. Mr. Sheffa identified for the jury the photographic lineups in which he positively identified the defendant as the shooter and Maceo as the man who accompanied the defendant.

On cross-examination, Mr. Sheffa reiterated that Mr. Sims, Jr., did not respond to the defendant's final request for money and testified that Mr. Sims, Jr., did nothing when the defendant pointed the handgun at Mr. Sims, Jr.'s, chest. Mr. Sheffa denied hanging his shirt on the back fence, explaining that he had removed his shirt to use as a pillow while he was lying in the neighbor's yard waiting for assistance. Mr. Sheffa testified that, to his knowledge, no drugs were present in the North Radford residence in the day or two preceding the shooting. Mr. Sheffa admitted that he had used cocaine and marijuana during the 24 hours that preceded the shooting, but he denied using the drugs at the North Radford residence.

Tamekia Hammond testified that she lived in a house across the street from Messers Sims. Ms. Hammond stated that, in the early morning hours of May 19, she was awakened by the sound of gunshots. Ms. Hammond peeked through the blinds covering her bedroom window, which faced North Radford, and she noticed the front door of the Sims residence was wide open, which she stated was very unusual. Ms. Hammond noticed "a shadow run up the street" toward Melrose High School. Ms. Hammond then saw two more figures "running around the side of the house," and she heard more gunfire. While continuing to watch through her window, Ms. Hammond saw one figure return to the front porch of the house. Ms. Hammond noticed that this person bent over and moved his arms around, although she was unable to discern what the person was doing. The figure then fled on foot.

When Ms. Hammond saw a gold car park in front of the Sims residence, she ventured outside and asked if Mr. Sims, Jr., was alright. When she learned that Mr. Sims, Jr., was dead, she approached the Sims house and noticed Mr. Sims, Jr.'s, pants pockets were turned out, which made her wonder if the motion she saw from the figure bending over the

front porch was the figure's "going through his pockets or something."

On cross-examination, Ms. Hammond stated she thought she heard "two to three shots maybe initially," followed by "[o]ne or two or three more," although she could not be certain. Ms. Hammond confirmed that, in the description she gave to the MPD, she noticed that the first man fleeing the scene was an African American male in his late teens or early 20s with short hair "or a twist," wearing a white t-shirt and blue jeans or denim shorts. Ms. Hammond described the second man who fled the scene as wearing a red shirt or jacket, and she described his hair as "a short fade cut" or "with twists or something."

Duvall Fletcher testified that he lived "[r]ight around the corner" from the Sims residence, that he had known Mr. Sims, Jr., for three or four years, and that he had known Mr. Sheffa all of his life. On May 19, he and his friend, Robert Louis Scales, left Mr. Scales's house around 2:00 to 2:30 a.m. to drive to the Sims residence; they intended to pick up Mr. Sheffa, who was going to give them a car battery. Mr. Fletcher testified that Mr. Scales was driving a small gold vehicle. Mr. Fletcher testified that, when they arrived at the Sims residence, he immediately noticed Mr. Sims, Jr., lying on the front porch. Just after they arrived at the Sims house, Mr. Fletcher noticed Ms. Hammond running across the street toward the house. Mr. Fletcher noticed that Mr. Sims, Jr.'s, pants pockets were turned out, but he never stepped onto the porch. Mr. Fletcher testified that MPD officers arrived at the scene "[a]bout three minutes" after he had arrived in Mr. Scales's vehicle.

Robert Scales testified that he had known Mr. Sheffa since childhood and that he had met Mr. Sims, Jr., two days prior to the shooting. Mr. Scales stated that he drove to the Sims residence in the early morning hours of May 19 to get a car battery from Mr. Sheffa. When he arrived at the house, he noticed "a guy laying on the porch," but he did not see Mr. Sheffa. Mr. Scales confirmed that Mr. Sims, Jr.'s, pockets were turned out when he first noticed Mr. Sims, Jr.'s body on the porch, and Mr. Scales testified that he never walked up the steps onto the porch.

Daniel Rawlings, who was 17 years old in 2011, testified that he had known the Messers Sims all of his life. Mr. Rawlings stated that, on May 18, he arrived at the Sims residence between 2:00 p.m. and 3:00 p.m. Around 4:00 p.m., Mr. Rawlings and Mr. Sims, Jr., left the Sims residence to pick up the defendant. Mr. Rawlings explained that he was in the eighth grade when he met the defendant and that he had become reacquainted with him in 2011. Mr. Rawlings, the defendant, and Mr. Sims, Jr., arrived at the Sims residence around "dinner time," after stopping to purchase food and beer. Upon their arrival, Mr. Sims, Jr., and the defendant began shooting dice while Mr. Rawlings finished his food and began drinking. Mr. Rawlings testified that Mr. Sims, Jr., "was winning all the money and [the defendant] got mad because Calvin was winning all the money." Mr. Rawlings stated that

Mr. Sims, Jr., returned $40 to the defendant, but the defendant requested that they continue shooting dice. Mr. Sims, Jr., agreed, and the defendant lost the $40 that Mr. Sims, Jr., had just returned to him. Mr. Rawlings recalled that the defendant lost $300 to $400 to Mr. Sims, Jr., over the course of two hours. The defendant then left the Sims residence. Mr. Rawlings testified that the defendant was angry when he departed but that he did not make any threats before leaving the house.

Approximately 15 minutes later, while Mr. Rawlings was still at the Sims residence with Mr. Sims, Jr., the defendant called Mr. Rawlings and threatened "to shoot up the house if" Mr. Sims, Jr., did not return his money. Mr. Rawlings relayed this threat to Mr. Sims, Jr., who then procured a rifle from a back room of the house, but after Mr. Rawlings told him that the defendant was "just joking," Mr. Sims, Jr., returned the rifle to the back room. Mr. Sims, Jr., asked Mr. Rawlings to "find somebody that had a weapon for sale." Mr. Rawlings returned to his own residence and placed a telephone call but was unable to procure a weapon for Mr. Sims, Jr. Mr. Rawlings then returned to the Sims residence. Mr. Sims, Jr., then told Mr. Rawlings to contact the defendant and "tell him to come get a hundred dollars back." The defendant refused to return, informing Mr. Rawlings that he "want[ed] all his money back."

Approximately 45 minutes later, while Mr. Rawlings was standing in the driveway of the Sims residence speaking to his girlfriend on his cellular telephone, the defendant returned. The defendant told Mr. Rawlings that he intended to apologize to Mr. Sims, Jr., and accept his offer of $100. Mr. Rawlings remained in the driveway while the defendant walked to the base of the front porch. Mr. Sheffa was sitting in a chair on the porch, and Mr. Sims, Jr., walked outside to speak with the defendant. At the same time, Mr. Gloston left the house to purchase beer for Mr. Sims, Jr. Mr. Rawlings testified that the defendant "was going to apologize for talking to [Mr. Sims, Jr.] crazy, talking about shooting up his house," to which Mr. Sims, Jr., replied, "'[Y]ou ain't the only one that will shoot.'" The defendant then asked Mr. Sims, Jr., to return his money, and Mr. Sims, Jr., stated, "'[Y]ou ain't getting nothing. You should have come and got it when I told you to come get it.'" Mr. Rawlings testified that the defendant "pulled out a gun and said, bitch, give me everything." Mr. Sims, Jr., responded, "'[Y]ou ain't getting shit. You got to shoot me." At this point, the defendant shot Mr. Sims, Jr. A few seconds later, the defendant shot Mr. Sheffa and then, when Mr. Sheffa tried to run, the defendant chased him and continued shooting. At that time, Mr. Rawlings ran in the direction of Melrose High School. He testified that he looked back when he heard Mr. Sims, Sr., screaming at Mr. Sims, Jr., to get up. Mr. Rawlings then heard more gunshots. Mr. Rawlings looked back once more and saw the defendant fleeing in the opposite direction.

When Mr. Rawlings arrived at his own residence, he called 9-1-1. A short time

later, the defendant called Mr. Rawlings and threatened to kill Mr. Rawlings and his sister if Mr. Rawlings told anyone what had happened. Due to this threat, Mr. Rawlings did not contact law enforcement officers immediately, but when officers arrived to speak with him the following day, he cooperated fully with the investigation, identifying the defendant from a photographic lineup. Mr. Rawlings testified that he had no trouble seeing what transpired on May 19.

Mr. Rawlings admitted that he was, at the time of trial, incarcerated on burglary and robbery charges and denied that he had been promised anything in exchange for his testimony. Mr. Rawlings testified that he was shorter than the defendant and stated that, on May 19, 2011, the defendant's hairstyle was "short dreds" combined "with a fade."

On cross-examination, Mr. Rawlings clarified that, when he called 9-1-1 following the shooting, he "told them somebody been shot at the bottom of Radford Street. And she asked me what the address was and I told her I didn't know." Mr. Rawlings stated that he then hung up because the defendant was calling him at the same time.

MPD crime scene investigator Marcus Mosby testified that he was the primary crime scene officer who responded to the shooting at the Sims residence. Upon arriving at the scene, Officer Mosby conducted an initial walk-through and then began taking photographs. Through Officer Mosby's testimony, the State introduced into evidence a number of photographs of the crime scene.

MPD Officer Timothy Monistere testified that he was dispatched to the Sims residence on May 19 and that he assisted Officer Mosby by taking measurements of pertinent evidence at the crime scene and by using those measurements to create sketches of the crime scene. Through the testimony of Officer Monistere, the State introduced into evidence, among other items, his crime scene sketches.

MPD Sergeant Kevin Lundy with the homicide bureau testified that he was called to the crime scene at 3:15 a.m. on May 19. Sergeant Lundy testified that the lighting conditions were good when he arrived at the scene. While conducting a search of the Sims residence, Sergeant Lundy found an 18-inch toy BB rifle behind the door of a back bedroom. Sergeant Lundy testified that no other guns or weapons were found in the residence, and he found no ammunition or drugs on the premises. Sergeant Lundy spoke with Mr. Sims, Sr., on May 19, and pursuant to that conversation, Sergeant Lundy spoke with Mr. Rawlings, who told Sergeant Lundy that the defendant had threatened the lives of him and his family. Mr. Rawlings also identified the defendant as the man who shot Mr. Sims, Jr., Mr. Sims, Sr., and Mr. Sheffa.

MPD Officer Michael Garner testified that, on May 20, 2011, he was instructed by the MPD homicide bureau to locate and arrest the defendant. Following an extensive search and chase on foot by MPD officers, Officer Garner located the defendant hiding underneath a house and placed him under arrest.

Doctor Marco Ross, Deputy Chief Medical Examiner of the Shelby County Medical Examiner's office, performed the autopsy of Mr. Sims, Jr. Doctor Ross testified that Mr. Sims, Jr., had suffered two gunshot wounds, one just above the sternal notch and another to the lower chest area on his left side. In addition, Doctor Ross observed abrasions on Mr. Sims, Jr.'s, upper right arm and right wrist, which Doctor Ross opined would have been consistent with Mr. Sims, Jr., hitting the porch following the shooting. Doctor Ross was unable to determine which bullet struck Mr. Sims, Jr., first. With respect to the bullet that struck Mr. Sims, Jr.'s, neck, Doctor Ross testified that it entered the airway just below the voice box, traveled through the esophagus, and exited through the spinal cord, likely causing immediate paralysis. When asked if Mr. Sims, Jr., would have been capable of telling his father that "they got me," Doctor Ross responded that it would have been possible though considerably difficult. Based on this gunshot alone, Doctor Ross opined that Mr. Sims, Jr., likely would have died within an hour if not within several minutes. The other bullet passed through Mr. Sims, Jr.'s, liver, the gastroesophageal junction, the aorta, and exited through his back. Although Doctor Ross did not believe that this injury was "necessarily immediately incapacitating," the two injuries together would have caused death within several minutes.

Doctor Ross testified that Mr. Sims, Jr.'s, toxicology report indicated a blood alcohol level equivalent of .341. In addition, the report showed evidence of both marijuana and cocaine use, and Doctor Ross opined that those two substances had been ingested sometime in the 24-hour period prior to Mr. Sims, Jr.'s, death. Based on the bullet entrances on Mr. Sims, Jr.'s, shirt relative to the bullet wounds on his body, Doctor Ross testified that the difference in position suggested that Mr. Sims, Jr.'s, position changed between the two gun shots. Doctor Ross agreed that the change in position would have been consistent with Mr. Sims, Jr.'s, falling after the first shot was fired. Doctor Ross opined that Mr. Sims, Jr.'s, cause of death was gunshot wounds to the torso and base of the neck and that the manner of death was homicide.

Special Agent Cervinia Braswell of the Tennessee Bureau of Investigation firearms identification unit testified as an expert witness for the State. In connection with the crimes at issue, Agent Braswell examined six nine-millimeter cartridge cases and, although she acknowledged that she did not have a handgun with which to match the nine-millimeter cartridge cases, she was able to determine that the six cases had been fired from the same nine-millimeter pistol.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify but did choose to present proof.

Demarco Blakely testified that he had known the defendant for five or six years and that he knew both Mr. Sims, Jr., and Mr. Sheffa. Mr. Blakely stated that, on May 18, 2011, his girlfriend picked him up at his grandmother's house on South Radford between 6:00 p.m. and 7:00 p.m. and that he and his girlfriend spent the evening at his girlfriend's apartment. Mr. Blakely left between 12:30 a.m. and 12:45 a.m. on May 19, and, at approximately the same time, he received a call on his cellular telephone from the defendant. Mr. Blakely told the defendant that he "was fixing to go see a chick," and the defendant asked if he could join Mr. Blakely. Mr. Blakely agreed and picked up the defendant from the defendant's mother's residence on Radford. The two proceeded to a woman's residence at the Lynnfield Apartments, arriving between 1:00 a.m. and 2:00 a.m. Once there, the defendant, Mr. Blakely, and the woman "watched movies, kicked it, then we had sex." Shortly after 3:00 a.m., Mr. Blakely and the defendant returned to Mr. Blakely's girlfriend's residence and stayed there until morning. Mr. Blakely drove the defendant back to his mother's house that morning.

On May 22, MPD officers picked up Mr. Blakely on a bench warrant and informed him that, based on a tip they had received, they believed he had information about a murder. Mr. Blakely spoke with homicide officers about his whereabouts on May 18 and 19, but he admitted that he did not tell the officers the truth about the events on that night because he was afraid. The officers showed Mr. Blakely a photographic lineup containing between 26 and 42 photographs, and Mr. Blakely identified a man named Courtney. Mr. Blakely admitted that the defendant's photograph was one of the many shown to him, but he did not tell officers that he recognized the defendant. Mr. Blakely explained that he was not trying to protect the defendant but rather that he was attempting to keep his girlfriend from discovering that he had cheated on her.

Mr. Blakely later learned that the defendant was a suspect in the murder of Mr. Sims, Jr., but he did not return to the MPD immediately to inform officers that the defendant was with him on the morning of May 19, only informing investigators of the defendant's whereabouts at a later date. Mr. Blakely testified that he did not see the defendant with a weapon on May 18 or May 19, that he had never seen the defendant with a handgun, and that he had never heard the defendant threaten anyone.

On cross-examination, Mr. Blakely stated that he had contacted the woman from the Lynnfield Apartments to tell her to come to court but that "her mother said she was

-10-

gone." Mr. Blakely surmised that the woman did not wish to come to court. Mr. Blakely clarified that his girlfriend had driven both him and the defendant back to their respective homes on the morning of May 19. Mr. Blakely admitted that he was arrested in the days following the shooting due to an outstanding warrant for possession of marijuana. With respect to his initial interview with homicide detectives, Mr. Blakely acknowledged that he was not truthful, telling the detectives that he and his girlfriend were alone on the morning of May 19 and denying that he recognized the defendant's photograph in the photographic lineup. Mr. Blakely also denied having any knowledge of Mr. Sims, Jr.'s, murder prior to his arrest. Mr. Blakely conceded that he spoke with the prosecutor in December 2012 and that he admitted to lying to law enforcement officers because he did not want his girlfriend to learn of his infidelity. With respect to multiple inconsistencies between Mr. Blakely's prior statements to law enforcement officers and his trial testimony, Mr. Blakely insisted that officers had misunderstood him and "got it wrong." On redirect examination, Mr. Blakely insisted that his testimony at trial was truthful.

In rebuttal, the State called Tim Helldorfer, Assistant Chief Investigator with the Shelby County District Attorney's office. Mr. Helldorfer testified that, in December 2012, he accompanied an assistant district attorney general to Mr. Blakely's house and that Mr. Blakely had stated that the defendant contacted him around 10:30 p.m. or 11:00 p.m. on May 18 to "meet up" and "go do a threesome." Mr. Helldorfer testified that Mr. Blakely clearly stated "several times" that he returned the defendant to the defendant's residence around 2:00 a.m. on May 19.

Based on this evidence, the jury convicted the defendant as charged of felony murder in perpetration of a robbery, first degree premeditated murder, two counts of attempted first degree murder, and the lesser offense of aggravated assault. The trial court merged the felony murder conviction with the first degree premeditated murder conviction and imposed an automatic sentence of life imprisonment with the possibility of parole. Following a sentencing hearing, the trial court sentenced the defendant to four years for the aggravated assault conviction and 20 years for each of the attempted first degree murder convictions. The trial court ordered the latter three convictions to be served concurrently to one another but consecutively to the life sentence, for an effective sentence of life plus 20 years.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. On appeal, the defendant contends that the trial court erred by permitting Ms. Gilliam to offer the hearsay testimony of her father and that the evidence adduced at trial was insufficient to support his convictions of first degree premeditated murder, felony murder, and attempted first degree murder. We consider each claim in turn.

*I. Hearsay Testimony*

The defendant first contends that the trial court erred by admitting into evidence Mr. Sims, Sr.'s, statements to Ms. Gilliam following the shooting. We disagree.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise provided by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of the inadmissibility of hearsay.

In the instant case, the State sought admission of the victim's statement via the excited utterance exception to the hearsay rule, embodied at Tennessee Rule of Evidence 803(2), which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(2). Three requirements must be met before a statement qualifies for admission pursuant to this hearsay exception:

> The first requirement is "a startling event or condition" that "suspend[s] the normal, reflective thought processes of the declarant." Second, the statement must "relate to" the startling event or condition. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (citations omitted). Our supreme court has stated that the "'ultimate test'" of admissibility via the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Id.* (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

In this case, the trial court conducted a brief bench conference and, after listening to Ms. Gilliam testify to the events preceding her father's statements, concluded that Mr. Sims, Sr.'s, statements were admissible under the excited utterance exception.

The record supports the ruling of the trial court. Ms. Gilliam testified that she arrived at the hospital just after 6:30 a.m. on May 19 and that her father began speaking to her as soon as she entered his hospital room. Ms. Gilliam stated that her father was crying and was very emotional, which was very uncharacteristic of him. Ms. Gilliam recalled that her father told her that "he heard gunshots" and that when he did not find his son in the front room of the house, he opened the front door and discovered Mr. Sims, Jr., lying on the front porch. Mr. Sims, Sr., told Ms. Gilliam that he attempted to help his son and that Mr. Sims, Jr., stated "'they got me, dad.'" Mr. Sims, Sr., then noticed a person appear from the back yard and begin shooting. Mr. Sims, Sr., stated that he then ran into the house, and he told Ms. Gilliam, "'Kim, that's all I know.'" Clearly, these statements relate to the startling events of Mr. Sims, Sr.'s, finding his son shot on the front porch and being shot himself, and the statements were made a few hours after the shooting when Mr. Sims, Sr., first saw his daughter and was still under the stress of the event, as evinced by Mr. Sims, Sr.'s, emotional state. Although it was not raised by the parties, Mr. Sims, Sr.'s, statement to Ms. Gilliam that Mr. Sims, Jr., said, "[T]hey got me, dad," is clearly hearsay within hearsay, *see* Tenn. R. Evid. 805, but it would also have been subject to the excited utterance exception, given the circumstances under which it was uttered. Accordingly, we conclude that the trial court did not err by admitting the victim's hearsay statement.

Even if, however, the trial court erred by admitting this hearsay testimony, Mr. Sims, Sr.'s, statements to Ms. Gilliam did not reveal any facts that were otherwise unknown. As such, any error from the admission of these statements was harmless.

The defendant is not entitled to relief on this issue.

## II. Sufficiency

The defendant argues that the evidence was insufficient to support his convictions of felony murder, first degree premeditated murder, and attempted first degree murder[1] because the State failed to prove that the defendant acted with premeditation or an intent to commit robbery. Again, we disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a

---

[1]The defendant does not challenge the sufficiency of his conviction of aggravated assault.

combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

*First Degree Premeditated Murder*

First degree premeditated murder, as charged in this case, is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007); *see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;]

and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the proof adduced at trial established that the defendant lost at least $300 to Mr. Sims, Jr., in a game of dice and that the defendant was angry when he left the Sims residence. Approximately 15 minutes later, the defendant called Mr. Rawlings and threatened "to shoot up the house" if Mr. Sims, Jr., did not return the money the defendant lost. The defendant arrived unannounced at the Sims house approximately 45 minutes later, and when Mr. Sims, Jr., refused to return the defendant's money, the defendant pointed a handgun at Mr. Sims, Jr., and demanded, "[B]itch, give me everything." When Mr. Sims, Jr., declined, the defendant fired two shots at Mr. Sims, Jr., killing him. The defendant's threat to "shoot up" the Sims residence coupled with his arrival at the Sims house armed with a loaded weapon and his subsequent shooting of Mr. Sims, Jr., who was unarmed, support a finding that the defendant committed the murder intentionally and with premeditation.

*Felony Murder*

As charged in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a).

It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it[.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). Moreover, "there should be a causal connection between the killing and the felony." *Buggs*, 995 S.W.3d at 106 (citing *Farmer*, 296 S.W.2d at 884; *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first degree murder conviction for "killings which are collateral to and separate from the underlying felony." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in

which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder.'" *Id.* (quoting *Buggs*, 995 S.W.2d at 107).

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the *res gestae* thereof, or where the homicide is so linked to the felony as to form one continuous transaction." *Buggs*, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d *Homicide* § 67 (1999)). "The *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *Payne v. State*, 406 P.2d 922, 925 (Nev. 1965)).

In the instant case, the proof at trial established that the defendant pointed a handgun at Mr. Sims, Jr., and demanded that Mr. Sims, Jr., return the money he had lost in the dice game. When Mr. Sims, Jr., refused, the defendant killed him. Ms. Hammond, who heard the initial gunfire and ran to her window, saw a figure return to the front porch of the Sims residence and bend over while moving his arms before fleeing the scene. Multiple witnesses reported that Mr. Sims, Jr.'s, pants pockets were turned out when his body was discovered, and photographs of his body at the scene corroborated those reports. The evidence supports the defendant's conviction of felony murder in perpetration of a robbery.

*Attempted First Degree Murder*

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* § 39-12-101(a)(2).

Here, the proof adduced at trial established that the defendant, after shooting Mr. Sims, Jr., twice, turned the gun on Mr. Sheffa, who was seated on the front porch of the Sims residence, and began firing. The initial shot knocked Mr. Sheffa off of the porch, and he ran toward the Sims's back yard. The defendant chased him and continued shooting until Mr. Sheffa managed to dive over a fence into a neighbor's yard. Mr. Sheffa sustained at least five gunshot wounds. The defendant then returned to the front porch of the Sims residence, presumably to retrieve the money from Mr. Sims, Jr.'s, pockets, where he encountered Mr. Sims, Sr., and shot him. Taking into account that the defendant fired multiple gunshots on these two unarmed victims immediately after killing Mr. Sims, Jr., and that he had earlier threatened to "shoot up the house," we hold the evidence adduced at trial sufficiently

-16-

supports the defendant's convictions of the attempted first degree murder of both Mr. Sheffa and Mr. Sims, Sr.

*III. Conclusion*

The trial court did not err by admitting Mr. Sims, Sr.'s, hearsay statement, and the evidence is sufficient to support the defendant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE